United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

GREGG R. CAHILL,

        Plaintiff,

  v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

Case No. 3:15-cv-02498-LB

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
AND DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

[ECF Nos. 45 & 50]

**INTRODUCTION**

    Plaintiff Gregg Cahill moves for summary judgment, seeking judicial review of a final decision by the Social Security Administration denying him disability benefits for his claimed disability of a spine disorder, exacerbated by winging scapula and plantar fibromatosis.[1] The Administrative Law Judge ("ALJ") found that Mr. Cahill did have the severe impairment of chronic neck- and back-pain disorder, but held that the severity was insufficient to qualify for Social Security Disability Insurance ("SSDI") benefits.[2] The Commissioner opposes Mr. Cahill's motion for summary judgment and cross-moves for summary judgment.[3]

---

[1] Motion for Summary Judgment – ECF No. 32 at 11-12. Citations are to the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of the documents.

[2] Administrative Record ("AR") 31.

[3] Cross-Motion – ECF No. 50.

Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties have consented to magistrate jurisdiction.[4] Upon consideration of the administrative record, the parties' briefs, and the applicable legal authority, the court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further administrative proceedings.

## STATEMENT

### 1. Procedural History

Mr. Cahill filed his initial disability claim on September 6, 2011, alleging disability beginning June 29, 2009.[5] The Social Security Administration ("SSA") stated that Mr. Cahill's disability was not severe enough to keep him from working and consequently denied his claim on October 26, 2011.[6]

Mr. Cahill timely appealed from the SSA's decision and requested a hearing before the ALJ.[7] The ALJ held the hearing in January 2013, in Pittsburgh, Pennsylvania.[8] Mr. Cahill attended the hearing unrepresented; ALJ Lamar W. Davis and impartial vocational expert ("VE") Danielle Shula also attended the hearing.[9] ALJ Davis addressed the issues of whether Mr. Cahill met the SSA's definition of "disabled" and also whether Mr. Cahill was disabled within the applicable disability period of June 29, 2009 to March 31, 2012.[10] The ALJ found that Mr. Cahill was not disabled.[11]

Mr. Cahill requested review of the ALJ's decision by the Appeals Council.[12] The Appeals Council denied his request, finding insufficient evidence of abuse of discretion, error of law, or a

---

[4] Consent Forms – ECF Nos. 20, 34.

[5] AR 82.

[6] AR 89

[7] AR 95-97.

[8] AR 29.

[9] AR 29, 75.

[10] *Id.*

[11] *Id.*

[12] AR 16.

United States District Court
Northern District of California

major public-policy concern.[13] The Appeals Council also found substantial evidence to support the decision.[14] The Appeals Council noted that the new evidence that Mr. Cahill submitted did not apply to their decision because they applied to dates after the last date insured.[15]

The Appeals Council later set aside its initial denial because Mr. Cahill submitted additional new evidence; the Appeals Council again denied Mr. Cahill's request for review.[16] The Appeals Council rejected Mr. Cahill's assertion that the ALJ was biased and again noted that the new evidence was not relevant to the applicable time period.[17]

After receiving an extension of time to file a federal suit,[18] Mr. Cahill appeared in the United States District Court for the Western District of Pennsylvania by filing his complaint and moving for leave to file *in forma pauperis*.[19] The SSA answered the complaint and moved for summary judgment.[20] Mr. Cahill twice moved for an extension of time to file a summary-judgment motion and the court granted those motions.[21]

In May 2015, Mr. Cahill filed a notice of change of address, a motion to transfer venue, and a third motion for an extension of time to file his summary-judgment motion; the court granted both motions, moving the case to the Northern District of California.[22] The court denied the SSA's first motion for summary judgment and granted another motion by Mr. Cahill to extend time.[23]

Once in this court, Mr. Cahill moved for summary judgment.[24] The SSA responded and cross-

---

[13] *Id.*

[14] *Id.*

[15] AR 17.

[16] AR 10.

[17] AR 11.

[18] AR 1, 2.

[19] Motion to Proceed *In Forma Pauperis* – ECF No. 1; Complaint – ECF Nos. 1-1 and 2.

[20] Answer – ECF No. 3; Motion for Summary Judgment – ECF No. 8.

[21] Motions for Extension of Time – ECF Nos. 6 & 10.

[22] Notice of Change of Address – ECF No. 12; Motion for Extension of Time – ECF No. 14, granted at ECF No. 15; Motion to Transfer Venue – ECF No. 13, granted at ECF No. 17.

[23] Motion for Extension of Time – ECF No. 25; Order – ECF No. 22.

[24] Motion for Summary Judgment – ECF No. 45; *see also* Exhibits and Supplemental Briefs – ECF Nos. 37, 37-1, 38, 40, 41, 43, & 44.

United States District Court
Northern District of California

moved for summary judgment.[25] Mr. Cahill then responded to the SSA's motion.[26]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Dr. Richard Kasdan: Neurological Consultant

Mr. Cahill met with Dr. Kasdan in August 2008 on a referral by his primary care physician, Dr. Vidhu Sharma.[27] Mr. Cahill saw Dr. Kasdan three and a half months after his car accident because his back pain worsened with pulsatile twitching in both legs, his hands were ice cold, and he had headaches and difficulties finding words.[28] Dr. Kasdan examined Mr. Cahill and found that his blood pressure was 138/80, that he had a supple neck and good range of back motion, no straight-leg raising pain, and no weakness, sensory loss, or reflex change.[29] Dr. Kasdan also found that Mr. Cahill's brain MRI was normal and that his lumbar MRI showed no significant pathological symptoms.[30] Dr. Kasdan noted that he did not think the unknown cause of sudden neurological symptoms was serious.[31]

#### 2.1.2 Dr. Vidhu Sharma: Primary-Care Physician

Mr. Cahill first saw Dr. Sharma in August 2008.[32] At this visit, Dr. Sharma noted that Mr. Cahill had not sought medical treatment following his car accident.[33] Mr. Cahill's symptoms at the time included twitching in his legs, numbness and pins and needles in his hands and feet, shakiness in his hands, and pressure in his back.[34] Dr. Sharma referred to Mr. Cahill's complaints as "vague" and "bizarre" and described his pain as "generalized back pain and radiculopathy down

---

[25] Motion for Summary Judgment and Opposition – ECF No. 50.

[26] Response – ECF Nos. 51 & 53.

[27] AR 242.

[28] *Id.*

[29] *Id.*

[30] *Id*; *see also* AR 245-46.

[31] *Id.*

[32] AR 249.

[33] *Id.*

[34] *Id.*

United States District Court
Northern District of California

1  the arms and legs."[35]

2  Mr. Cahill returned to Dr. Sharma's office following the referral to Dr. Kasdan.[36] At this visit,

3  Dr. Sharma noted that Mr. Cahill sought additional referrals to specialists, including a

4  neurosurgeon and an orthopedist.[37] Dr. Sharma also noted that Mr. Cahill needed an MRI of his

5  thoracic spine.[38]

6  Dr. Sharma later examined the results of Mr. Cahill's thoracic spine MRI and found the results

7  to be "essentially unremarkable."[39]

8  ### 2.1.3 Dr. Alexander Kandabarow: Orthopedics Specialist

9  Mr. Cahill first saw Dr. Kandabarow in November 2008, and Dr. Kandabarow evaluated him

10  for his neurological symptoms caused by the car accident, including his leg and arm twitching.[40]

11  Dr. Kandabarow noted that Mr. Cahill was stiff, which made it difficult for him to bend forward or

12  backward.[41] Dr. Kandabarow also noted that Mr. Cahill had difficulty abducting his shoulders, that

13  his ability to bend forward was 80% of normal, and that he had symptoms of degenerative disc

14  disease at C5-6 and C6-7.[42] Dr. Kandabarow also examined Mr. Cahill's consultation with Dr.

15  Michael McQuillen at Stanford University Medical Center, and found that Mr. Cahill's scans

16  showed no significant abnormalities other than the degenerative disc disease.[43]

17  Later that month, Mr. Cahill returned to Dr. Kandabarow's office, seeking more information

18  regarding whether he had a fracture in the thoracic spine.[44] Dr. Kandabarow found that there was

19  no fracture, that Mr. Cahill's bone scan was normal, and that there were no surgical indications.[45]

---

[35] *Id.*

[36] AR 247.

[37] *Id.*

[38] *Id.*

[39] AR 250.

[40] AR 253.

[41] *Id.*

[42] AR 254.

[43] *Id.*

[44] AR 252.

[45] *Id.*

United States District Court
Northern District of California

Mr. Cahill saw Dr. Kandabarow next in December 2008, because although his range of motion had increased, the pain remained the same.[46] Dr. Kandabarow ordered a cervical MRI for further information and recommended continued physical therapy.[47] He took an MRI of Mr. Cahill's cervical spine and found that osteophyte complexes were present at C5-6 and C6-7, but that no other abnormalities were present.[48]

### 2.1.4 Dr. Michael McQuillen: Neurological Consultant

Mr. Cahill traveled to California from his home in Pennsylvania in October 2008 to be seen by a neurologist at Stanford University Medical Center, where Dr. McQuillen examined him.[49] Dr. McQuillen noted that weeks after the car accident, Mr. Cahill started to feel tingling, numbness, shakiness, and experienced vision problems.[50] Dr. McQuillen also noted that Mr. Cahill had severe headaches, which were successfully treated with Indocin, a medication.[51] He also noted a bulge in the right plantar region, as well as a lack of notable symptoms regarding ataxia, tremor, sensations, blood pressure, and coordination.[52] Dr. McQuillen examined the results of the previous MRI scans and found no abnormalities, but noted that the images covered only the lower part of Mr. Cahill's spine and therefore more scans were necessary of his thoracic spine.[53] He also referred Mr. Cahill to the Pain Management Center.[54] In a note, Dr. McQuillen examined an x-ray done on Mr. Cahill's thoracic spine, and found degenerative disc disease and a wedge compression fracture on T1.[55] However, this second finding was contradicted by a follow-up appointment with Dr. Huy Do at Stanford in April 2009, which showed that there was no compression deformity in T1.[56]

---

[46] AR 251.

[47] *Id.*

[48] AR 376, 378.

[49] AR 257.

[50] AR 258.

[51] *Id.*

[52] AR 259.

[53] *Id.*

[54] *Id.*

[55] AR 260.

[56] AR 262.

Mr. Cahill returned to Dr. McQuillen's office in January 2009, following the visits to Dr. Kandabarow in Pennsylvania and months of physical therapy.[57] Dr. McQuillen noted improvement on the previous symptoms, attributing it to physical therapy.[58] He acknowledged, however, that Mr. Cahill continued to have pain in his spine, between his shoulder blades, and running up and down his back, and that this pain was exacerbated by bending and reaching.[59]

Dr. McQuillen referred Mr. Cahill to Dr. Wendye Robbins.[60] Dr. Robbins noted that Mr. Cahill functioned best in the mornings, but that spasms and myalgias developed throughout the course of the day and he had severe pain in his mid-thoracic spine.[61] She noted that Mr. Cahill took only NSAIDs regularly, had refused Vicodin, and had stopped taking Flexeril.[62] At the time, Mr. Cahill was still working, but struggled with working and spent most of his lunch hour in his car sleeping.[63] After examination, Dr. Robbins found that Mr. Cahill suffered from thoracic medial-branch disease and recommended that he undergo medial-branch blocks.[64]

### 2.1.5 Dr. Joshua Pal: Treating Physician

In March 2009, at Stanford Hospital and Clinics, Dr. Joshua Pal and Dr. Raymond Gaeta performed a T1-T4 medial-branch-block procedure.[65] Dr. Pal noted that Mr. Cahill tolerated the procedure well and there were no complications.[66] Dr. Pal, writing a note two weeks after the procedure, noted that although initially pain levels were the same following the procedure, Mr. Cahill felt a "significant difference in his pain-free range of motion and ability to ambulate with a more normal posture" three days after the procedure.[67] However, Dr. Pal noted that this was likely

---

[57] AR 255.

[58] *Id.*

[59] *Id.*

[60] AR 367.

[61] AR 368.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] AR 366.

[66] *Id.*

[67] AR 363.

related only to the steroid injection, because after the steroid wore off, Mr. Cahill's pain level returned to the same as it was before the procedure.[68] Dr. Pal also noted that the procedure was capable of repetition and referred Mr. Cahill to Dr. Huy Do for examination regarding potential vertebroplasty.[69] Dr. Pal stated that the pain was causing Mr. Cahill a number of symptoms, including insomnia, which could be exacerbating his symptoms, and suggested muscle relaxants, sleep medication, and a few other pain medications.[70]

Dr. Do later performed another MRI.[71] Dr. Do determined that a vertebroplasty was not appropriate and that the compression deformity noticed by other doctors almost certainly did not exist.[72]

Dr. Pal and Dr. Ian Carroll discussed Mr. Cahill's symptoms, and compiled their findings into a follow-up note.[73] Dr. Pal noted that Mr. Cahill continued to experience discomfort.[74] Dr. Pal administered a number of maneuver tests that showed a large difference in the contour of the scapula.[75] The left side of the scapula winged out more than the right and the soft tissue on the left side of the thoracic spine, at T5, was tender.[76] Dr. Pal noted that the winged scapula may indicate a neuropathy in the dorsal scapula nerve, the long thoracic nerve, or the spinal accessory nerve.[77]

Dr. Pal referred Mr. Cahill to Dr. Alpana Gowda to determine which nerve was injured.[78] In June 2009, Dr. Gowda performed an electrodiagnostic study on Mr. Cahill and found a right ulnar neuropathy at the elbow.[79] The study showed no evidence of long thoracic neuropathy, spinal-

---

[68] *Id.*

[69] AR 363-64.

[70] AR 364-65.

[71] AR 361-62.

[72] *Id.*

[73] AR 359-61.

[74] AR 359.

[75] AR 360.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] AR 358.

1   accessory neuropathy, carpal-tunnel syndrome, or cervical radiculopathy.[80]

2       Dr. Pal also referred Mr. Cahill for specialized electrical stimulation to strengthen the serratus

3   anterior on the left side.[81] In July 2009, Dr. Carroll reexamined Mr. Cahill.[82] Mr. Cahill displayed

4   continued winging of the scapula on the left side.[83] Dr. Carroll went over the use of the muscle

5   stimulator and advised Mr. Cahill to continue using the muscle stimulator for two weeks to

6   strengthen the serratus muscle.[84] In August 2009, Mr. Cahill stated that he had not experienced a

7   benefit after using the muscle stimulator for approximately 11 days.[85] Dr. Carroll advised Mr.

8   Cahill to continue using the muscle stimulator for a few additional weeks.[86]

9       **2.1.6 Dr. Stephen Coleman: Treating Physician**

10       In September 2009, Dr. Stephen Coleman and Dr. Garrett Morris evaluated Mr. Cahill at

11   Stanford.[87] Dr. Coleman noted that Mr. Cahill used the electrical muscle stimulator, but felt no

12   significant alteration in his pain level.[88] Upon examination, Dr. Coleman found tenderness of the

13   left paraspinal muscles in the mid thoracic region, slight tactile allodynia, hyperesthesia,

14   hyperalgesia, and decreased range of motion of the left shoulder.[89] Dr. Coleman noted only mild

15   scapular winging on the left side, contrary to previous reports of profound scapular winging.[90]

16   Although Mr. Cahill denied improvement in pain, physical examination suggested improved

17   serratus anterior strength.[91] Dr. Coleman recommended left-sided medial-branch blocks and

18   continued use of the muscle stimulator.[92]

19   [80] *Id.*

20   [81] AR 360.

21   [82] AR 353.

22   [83] *Id.*

     [84] *Id.*

23   [85] AR 352.

24   [86] *Id.*

     [87] AR 350.

25   [88] *Id.*

26   [89] *Id.*

     [90] *Id.*

27   [91] *Id.*

28   [92] *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In September 2009, Dr. Gerald Matchett and Dr. Timothy Dawson performed the left thoracic medial-branch block.[93] Dr. Matchett noted the Mr. Cahill tolerated the procedure well and experienced no complications.[94]

Dr. Coleman saw Mr. Cahill for a follow-up appointment in November 2009.[95] Dr. Coleman noted that the medial-branch-block procedure, administered in September 2009, relieved pain on the left side by approximately 50%.[96] Mr. Cahill appeared to be in no apparent distress and displayed no pain behaviors.[97] Dr. Coleman noted a slight prominence of the interior aspect of the left scapula with internal rotation of Mr. Cahill's shoulders.[98] Mr. Cahill displayed tenderness paraspinally from T3-T6 bilaterally, no decreased sensation, and hyperesthesia over the paraspinal muscles medial to the scapula.[99] Dr. Coleman advised Mr. Cahill to continue using the electrical muscle stimulator and gradually start increasing his activity by swimming and stretching.[100]

Dr. Coleman saw Mr. Cahill for an additional follow-up appointment in February 2010 for ongoing posterior thoracic chest pain.[101] Mr. Cahill complained of worsened pain between the scapula, exacerbated by abducting his shoulders and performing activities with his arms in front of him.[102] Upon examination, Dr. Coleman noted no pain behaviors, obvious asymmetry, allodynia, sensory changes to ice, or tenderness over the scapula.[103] Mr. Cahill displayed hyperpathia over the medial aspect of the scapula bilaterally and tenderness over the rhomboids.[104] Dr. Coleman noted that most of the pain appeared to be in the rhomboid muscles.[105] He recommended starting

---

[93] AR 348.

[94] AR 347.

[95] AR 345.

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] AR 342.

[102] AR 343.

[103] *Id.*

[104] *Id.*

[105] *Id.*

Mr. Cahill on Neurontin titrate, trigger-point injections, and physical therapy after the trigger-point injections.[106]

### 2.1.7 Dr. David Barrows: Treating Physician

In February 2010, Dr. Vanila Singh performed a trigger-point injection of the bilateral shoulder area.[107] After the injection, Dr. David Barrows and Dr. Gowda saw Mr. Cahill for a follow-up appointment.[108] Mr. Cahill claimed the trigger-point injection in February did nothing to relieve pain.[109] Dr. Barrows noted the left-side paraspinal area was larger than the right-side and very tender to palpation.[110] Mr. Cahill exhibited decreased left-side rhomboid muscle mass and hyperpathia.[111] His right-side shoulder displayed full range of motion and the left side showed decreased abduction to approximately 20 degrees above horizontal.[112] Dr. Barrows noted no evidence of impingement, tenderness, or pain in the shoulder.[113]

Dr. Barrows noted no evidence of winging scapula and recommended a repeat of the left-sided medial-branch blocks.[114] In April 2010, Dr. Jennifer Hah and Dr. Matthew Wedemeyer performed thoracic medial-branch blocks at left T3, T4, and T5.[115]

### 2.1.8 Nurse Practitioner Theresa Malick-Searle: Treating NP

Mr. Cahill first saw Nurse Practitioner ("NP") Theresa Malick-Searle at Stanford in April 2010, for a follow-up appointment after the repeat left medial-branch block.[116] Mr. Cahill reported a 50% reduction in left-side thoracic back pain and an increase in right-side thoracic back pain.[117]

---

[106] *Id.*

[107] AR 342.

[108] AR 339.

[109] AR 340.

[110] *Id.*

[111] *Id.*

[112] AR 340-41.

[113] AR 341.

[114] AR 340.

[115] AR 336.

[116] AR 332-33.

[117] AR 333.

NP Malick-Searle noted that Mr. Cahill expressed his "typical pain complaints" and denied any change in quality, characteristic, or location of pain.[118] Mr. Cahill expressed no new neurosensory deficits, weakness, or pain.[119] Mr. Cahill continued to use the e-Stim muscle stimulator and was taking Ibuprofen and Zantac.[120] NP Malick-Searle offered and recommended prescriptions for Lyrica, Celebrex, Zantac, and Lidoderm patches.[121] She also scheduled Mr. Cahill for a repeat right-side T3, T4, T5 medial-branch block.[122]

Later in April 2010, Dr. Matthew Wedemeyer and Dr. Mark Gjolaj performed a right-side medial-branch block on T3, T4, and T5.[123] In July 2010, Mr. Cahill saw NP Malick-Searle for a follow-up appointment.[124] Mr. Cahill reported a greater than 50% reduction in right-side mid-thoracic back pain.[125] NP Malick-Searle offered Mr. Cahill new prescriptions for Lyrica, Celebrex, and Lidoderm patches, as well as recommended pulsed radiofrequency ablation on the right T3-T5 medial branches and pulsed radiofrequency ablation on the left T3-T5 medial branches.[126]

In July 2010, Dr. Wedemeyer and Dr. Scanlon performed thoracic medial-branch pulse-radiofrequency neuroplasty at right T3, T4, and T5.[127] In August 2010, Mr. Cahill returned to undergo thoracic medial-branch pulse-radiofrequency neuroplasty on left T3, T4, and T5.[128] Dr. Wedemeyer and Dr. Sam Lahidjl performed the procedure.[129] The procedure was successful at T4.[130] However, at T3 and T5, Dr. Wedemeyer was unable to obtain appropriate sensory

---

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] AR 334.

[122] *Id.*

[123] AR 328-32.

[124] AR 326-28.

[125] AR 326.

[126] AR 326-27.

[127] AR 320.

[128] AR 312-19.

[129] AR 312-13.

[130] AR 313.

stimulation, so he proceeded with a thoracic medial-branch block to left T3 and T5.[131] In August 2010, Mr. Cahill saw Dr. Meredith Brooks and Dr. Wendye Robbins for a follow-up appointment.[132] Mr. Cahill reported effective pain control on the right side following the procedure and less improvement in pain on the left side.[133] Mr. Cahill continued to use his electronic stimulator and conduct physical therapy exercises at home.[134] Dr. Brooks noted tenderness along the T3-T5 vertebrae, increased tenderness on the left greater than the right, left scapula slightly more prominent than the right, symmetric shoulders, and non-antalgic gait.[135] Dr. Brooks recommended no interventions in care plan at that time.[136]

In January 2011, Mr. Cahill saw NP Malick-Searle again for a follow-up appointment.[137] Mr. Cahill expressed that he was battling with his insurance company for his last two procedures and that he was interested in trialing new medications.[138] NP Malick-Searle recommended starting Mr. Cahill on Desipramine.[139]

In February 2011 Dr. Paul Ford treated Mr. Cahill for a left-medial-knee injury.[140] Dr. Ford prescribed brace immobilization, took an MRI, and referred him to physical therapy.[141] Dr. Ford's diagnosis was an acute meniscal tear of the left lower knee and an MCL sprain.[142] In March 2011, Mr. Cahill saw NP Malick-Searle for a follow-up appointment.[143] Mr. Cahill reported that he experienced profound dizziness as a side effect of Desipramine, which caused him to lose balance

---

[131] Id.
[132] AR 308-11.
[133] AR 309.
[134] AR 310.
[135] Id.
[136] Id.
[137] AR 304-05.
[138] Id.
[139] AR 305.
[140] AR 300-03.
[141] AR 302.
[142] Id.
[143] AR 298-300.

United States District Court
Northern District of California

and suffer a level-two MCL tear in his left knee.[144] Mr. Cahill discontinued the use of

Desipramine and was not interested in any new medications that may alter cognition.[145] NP

Malick-Searle noted that Mr. Cahill's musculoskeletal and neurosensory exam was unchanged

from his prior follow-up visit.[146] NP Malick-Searle made no new medication recommendations,

scheduled Mr. Cahill for a repeat left T3-T5 pulsed radiofrequency ablation, and scheduled

acupuncture treatments to be performed by Dr. Kong.[147]

    In May 2011, NP Malick-Searle scheduled Mr. Cahill for both right-side and left-side thoracic

medial-branch blocks of T3-T5, and acupuncture therapy.[148] Mr. Cahill's musculoskeletal and

neurosensory exam was essentially unchanged.[149]

### 2.1.9 Dr. Jiang-Ti Kong: Acupuncture Specialist

    In July 2011, Mr. Cahill first saw Dr. Jiang-Ti Kong for a consultation.[150] Dr. Kong noted that

Mr. Cahill appeared to be otherwise healthy, except the following: (1) longstanding axial thoracic

pain; (2) thoracic medial-branch disease from T2-T4; (3) long-thoracic neuropathy bilaterally

post-traumatic; and (4) insomnia.[151] Dr. Kong recommended medial-branch blocks (already

scheduled at the time), physical therapy, continued acupuncture treatments, and no new

medications.[152]

    Dr. Kong provided Mr. Cahill's first acupuncture treatment with electrical stimulation in July

2011.[153] Mr. Cahill received four more acupuncture treatments from Dr. Kong on August 4, 11,

18, and 25, 2011.[154] At the August 4 treatment, Dr. Kong noted that Mr. Cahill's pain worsened

---

[144] AR 298.

[145] AR 298-99.

[146] AR 299.

[147] AR 299-300.

[148] AR 296-97.

[149] AR 296.

[150] AR 291-94.

[151] AR 293.

[152] AR 294.

[153] AR 290-91.

[154] AR 278-90.

United States District Court
Northern District of California

for a few days following the first acupuncture procedure and then returned to the baseline.[155] Mr. Cahill presented with upper-back pain, bilateral T3-T5 medial branch disease, and bilateral long-thoracic neuropathy.[156] At the August 11 treatment, Mr. Cahill reported that his pain was exacerbated by the previous acupuncture procedure.[157] At the August 18 treatment, Mr. Cahill reported no improvement in pain from the previous acupuncture treatments.[158] At the August 25 treatment, Dr. Kong noted that the procedure "worked moderately" the week before, but that Mr. Cahill had the same upper-back pain between his shoulder blades.[159]

### 2.1.10 Dr. Matthew Wedemeyer and Dr. Stephen Coleman: Surgeons

In September 2011, Dr. Matthew Wedemeyer and Dr. David Peng performed thoracic medial-branch blocks at right T3-T5.[160] Later in September 2011, Dr. Stephen Coleman and Dr. Alan Hagstrom performed thoracic medial-branch blocks at left T3-T5.[161] Mr. Cahill saw NP Malick-Searle for a follow-up appointment.[162] At this appointment, Mr. Cahill presented "typical pain complaints" and denied any change in quality, characteristic, or location of pain.[163] Mr. Cahill reported no sustainable benefit from acupuncture treatments, and a 40% to 50% reduction in localized pain form the recent right-side and left-side thoracic-medial-branch-block procedures.[164] NP Malick-Searle noted all of Mr. Cahill's extremities moved without difficulty, he displayed symmetrical strength and muscle development, and his neurosensory evaluation was unchanged.[165] Mr. Cahill's insurance continued to deny coverage for any future bilateral-pulse-

---

[155] AR 288.

[156] AR 289.

[157] AR 285.

[158] AR 282.

[159] AR 278.

[160] AR 273-78.

[161] AR 267-73.

[162] AR 264-66.

[163] AR 264.

[164] AR 264-65.

[165] AR 265.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    radiofrequency-ablation treatment.[166] NP Malick-Searle recommended no medication changes, but

2    advised Mr. Cahill to continue using Ibuprofen and lidocaine.[167]

3        **2.1.11 Dr. Gregory P. Mortimer: SSA Evaluating Physician**

4        Dr. Mortimer, an SSA evaluating physician, completed a disability-determination analysis on

5    Mr. Cahill dated October 25, 2011.[168] During the medical portion of the disability determination,

6    Dr. Mortimer noted that Mr. Cahill had a normal gait, normal strength and reflexes, and that his

7    "sensory" [sic] was intact.[169] Dr. Mortimer also noted the medically determinable impairment of

8    severe disorders of back (discogenic and degenerative).[170] Dr. Mortimer "considered" applying the

9    1.04 "Spine Disorders" listing in his analysis.[171]

10       Dr. Mortimer noted that the medically determinable impairment could reasonably be expected

11   to produce Mr. Cahill's symptoms and pain.[172] However, the intensity, persistence, and

12   functionally limiting effects of the symptoms were not substantiated by the objective medical

13   evidence alone.[173]

14       Dr. Mortimer found that Mr. Cahill had the following exertional limitations: (1) can

15   occasionally (one-third or less of an eight-hour day) lift or carry (including upward pulling) twenty

16   pounds; (2) can frequently (more than one-third up to two-thirds of an eight-hour day) lift or carry

17   (including upward pulling) ten pounds; (3) can stand or walk, with normal breaks, for a total of six

18   hours in an eight-hour day; (4) can sit, with normal breaks, for a total of six hours in an eight-hour

19   day; (5) can push or pull, including hand and foot controls, for an unlimited time.[174]

20       Dr. Mortimer also found that Mr. Cahill had postural limitations with the ability to

21

22   _____

     [166] *Id.*

23   [167] AR 266.

24   [168] AR 82-88.

     [169] AR 84.

25   [170] *Id.*

26   [171] *Id.*

     [172] *Id.*

27   [173] *Id.*

28   [174] AR 85.

occasionally: (1) climb ramps or stairs; (2) climb ladders, ropes, or scaffolds; (3) balance; (4) bend at the waist or "stoop"; (5) kneel; (6) crouch; or (7) crawl.[175] Dr. Mortimer noted no manipulative, visual, communicative, or environmental limitations.[176]

Based on the record evidence, Dr. Mortimer found that treatment for Mr. Cahill's symptoms, including radiofrequency ablation, were generally successful.[177] Dr. Mortimer also found that Mr. Cahill did not require an assistive device to "ambulate" and that the prescribed medications were relatively effective in controlling his symptoms.[178] Dr. Mortimer noted that Mr. Cahill's statements were partially credible.[179]

Assessing relevant vocational factors, Dr. Mortimer found that Mr. Cahill had no past relevant work.[180] Dr. Mortimer found that even with his impairment, Mr. Cahill was not limited to unskilled work.[181] Dr. Mortimer also found that Mr. Cahill could sustain "light" work based on "strength factors" including: lifting or carrying, standing, walking, sitting, pushing, and pulling.[182] Dr. Mortimer found that non-exertional limitations did not exist.[183]

Dr. Mortimer determined that Mr. Cahill was "not disabled."[184]

### 2.2 Mr. Cahill's Testimony

Mr. Cahill testified before the ALJ in January 2013.[185] The ALJ first asked Mr. Cahill about his educational background and work history.[186] Mr. Cahill completed 170 college credits over the course of six years in a variety of majors.[187] Between 2003 and 2009, Mr. Cahill worked at a

---

[175] AR 86.

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] AR 87.

[181] *Id.*

[182] AR 87-88.

[183] AR 88.

[184] *Id.*

[185] AR 44-75.

[186] AR 45-47.

[187] AR 45.

mortgage company in various positions including compliance officer, auditor, loan coordinator, loan processor, underwriter, and post-closing specialist.[188] Mr. Cahill also worked as a title-clearance specialist at a title company.[189] In 2008, Mr. Cahill was involved in a motor-vehicle accident where he sustained injuries to his ribs, shoulder, left knee, and the thoracic area.[190]

The ALJ questioned Mr. Cahill about what parts of his body continue to trouble him after the motor-vehicle accident, specifically his thoracic-nerve injury.[191] Mr. Cahill responded that the focal point of his pain is the thoracic area between the shoulder-blade and the spine.[192] He stated that he was diagnosed with winging scapula, meaning the area between the spine and the scapula protruded because the muscles were not holding it in place.[193] Mr. Cahill experienced weakness and pain in that area with everything he did.[194]

The ALJ then questioned Mr. Cahill about his ability to do certain tasks.[195] Mr. Cahill stated that he used the left hand, the hand that was affected, as much as he could tolerate.[196] He was unable to wash a pan of dishes, even with his elbow supported.[197] Mr. Cahill also supported his elbow when he drove his car.[198] He was precluded completely from attempting tasks such as washing walls or windows because of shooting pain and numbness.[199] The ALJ then asked Mr. Cahill if his doctors had encouraged him to increase his amount of exercise.[200] Mr. Cahill responded that his doctors said physical therapy was "tolerable."[201] He also said that the doctors he

---

[188] AR 46.

[189] *Id.*

[190] AR 49-50.

[191] *Id.*

[192] AR 50.

[193] AR 50-51.

[194] *Id.*

[195] AR 52-53.

[196] AR 52.

[197] *Id.*

[198] *Id.*

[199] AR 55-56.

[200] AR 57.

[201] *Id.*

saw "discounted anything in the cervical area" even though two previous MRIs showed that the cervical C6 and C7 disks "caus[ed] a problem."[202] Mr. Cahill also testified that he had osteophytes, or "bone spurs coming in from the back," and stenosis.[203] He said he had "pressure on the back of the spine coming in from the vertebrae," and ruptured disks in C6 and C7.[204]

The ALJ asked Mr. Cahill if the doctors ever told him that he had "any neural compression or root compression."[205] Mr. Cahill responded no, but stated that he had been using an electric stimulator on his side for three and a half years that was "just enough to kind of maintain that."[206] Mr. Cahill testified that without the electronic stimulator his side was "even worse" and "everything just droops."[207] The electronic stimulator helped "[innervate] the muscles" and provided stability.[208] Mr. Cahill testified that in the months preceding the ALJ hearing, a new MRI showed "that C6 and C7 are inn[er]vate the bracho plexis nerves" and "in turn innervate the [INAUDIBLE] muscles and the dorsal scapular muscles."[209]

The ALJ asked Mr. Cahill what treatments had been offered after the latest discovery.[210] Mr. Cahill responded that he had received an epidural steroid injection to relieve inflammation and reduce pain in the area.[211] Mr. Cahill also stated that he had received "numerous nerve blocks in the thoracic area," radiofrequency ablation,[212] and a spinal-cord stimulator.[213] Mr. Cahill testified that the next step was for him to see a neurosurgeon and an orthopedist.[214] He also testified that his

---

[202] Id.

[203] Id.

[204] Id.

[205] Id.

[206] AR 58.

[207] Id.

[208] Id.

[209] Id.

[210] Id.

[211] Id.

[212] Transcript says "greater frequency of ablation" which the court assumes to mean "radiofrequency ablation."

[213] AR 59.

[214] Id.

United States District Court
Northern District of California

doctors are considering a discectomy laminectomy.[215] The ALJ then asked if the decision to have surgical intervention was up to Mr. Cahill.[216] Mr. Cahill's responded that he would get the procedures because he "can't function like this."[217]

The ALJ asked Mr. Cahill what medications he had been prescribed.[218] Mr. Cahill's response was "[n]ever, never opioids." Mr. Cahill further stated that he had been offered medical marijuana, but that he didn't want it and didn't want anything that could be addictive.[219] Mr. Cahill testified that he had previously been on Gabapentin, Neurontin, and Lyrica and the side effects to those medications had been "terrible."[220] Mr. Cahill testified that while on these medications he split his head open and suffered a knee injury.[221] He stated that "with no warning, sometimes [he'd] get a shooting pain down [his] back and just get thrown."[222] The ALJ then asked Mr. Cahill if after those incidents the doctors took Mr. Cahill off the medications.[223] Mr. Cahill responded yes, and that they additionally prescribed Gabapentin, Dicipromine, and Cymbalta.[224] Mr. Cahill testified that he could not afford to take Cymbalta, as it was over $500 for one prescription.[225] Mr. Cahill testified that he had been taking 800 milligrams of Ibuprofen for the last four and a half years up to three or four times a day.[226] Mr. Cahill also testified to using Lidoderm patches and Lidocaine gel.[227]

---

[215] Id.

[216] Id.

[217] Id.

[218] AR 60.

[219] Id.

[220] Id.

[221] Id.

[222] Id.

[223] AR 61.

[224] Id.

[225] Id.

[226] AR 61-62.

[227] AR 62.

The ALJ asked Mr. Cahill if he had trouble walking and how far he could walk.[228] Mr. Cahill responded that he had trouble walking "any distance" and he could manage about a quarter-mile.[229] He walked with his head down because looking up or out interfered with his balance and he would "teeter."[230] The ALJ asked Mr. Cahill if he did physical therapy and how it went.[231] Mr. Cahill responded that he did therapy including: physical therapy, massage therapy, and the use of a TENS unit.[232] However, Mr. Cahill testified that about two hours after therapy his muscles would lock up.[233] The ALJ then asked if he did any home exercises as part of physical therapy.[234] Mr. Cahill testified that he did, until he received MRI results that he believed indicated that physical therapy may have worsened the situation.[235] Mr. Cahill testified that he would "move a little bit just to keep some range of motion."[236]

Mr. Cahill testified that he had to completely change his lifestyle.[237] He used to be active, work out six days a week, swim ten miles a week, mountain-climb, bike, and hike.[238] The ALJ asked Mr. Cahill what he did to occupy himself during waking hours.[239] Mr. Cahill responded that he spent his time on the internet, playing video games, and reading.[240] Mr. Cahill alternated between sitting, standing, and lying down.[241] He spent as much time in one position as possible before moving, and slept no more than three hours at a time because the pain would wake him

---

[228] AR 63.

[229] *Id.*

[230] *Id.*

[231] *Id.*

[232] *Id.*

[233] *Id.*

[234] AR 64.

[235] *Id.*

[236] *Id.*

[237] AR 65.

[238] *Id.*

[239] AR 66.

[240] *Id.*

[241] *Id.*

up.[242] Mr. Cahill testified to having constant feelings of fatigue.[243]

The ALJ then questioned Mr. Cahill about his daily routine.[244] This included browsing the computer, lunch, napping, dinner, watching TV, cooking, washing dishes, shopping for groceries, laundry, running errands, feeding the cats, and talking to the neighbor.[245] The ALJ asked Mr. Cahill how he spent his time on the internet.[246] Mr. Cahill responded that he read "everything" about his injuries.[247] Mr. Cahill was not encountering any problems with authority figures or stressful situations, and he testified that he did not develop an emotional condition.[248] The ALJ then posed a question to Mr. Cahill that if someone watched him during the course of his average 16-hour day, doing what he felt comfortable doing around the house, how much time would they observe he spent doing absolutely nothing that was productive.[249] Mr. Cahill responded that 7 hours out of a 16-hour day would be "downtime."[250]

Lastly, the ALJ asked Mr. Cahill about his settlement.[251] Mr. Cahill testified that his settlement was approximately $74,000 for past medical bills.[252] Mr. Cahill also testified that the settlement did not include lost wages or pain and suffering.[253]

### 2.3 Vocational-Expert Testimony

Vocational Expert Danielle Shula testified at the hearing on January 9, 2013.[254] The ALJ first asked Ms. Shula to classify Mr. Cahill's past work.[255] Ms. Shula stated that Mr. Cahill had been a

---

[242] *Id.*

[243] *Id.*

[244] AR 67.

[245] *Id.*

[246] AR 68.

[247] *Id.*

[248] *Id.*

[249] AR 70-72.

[250] AR 72.

[251] AR 73.

[252] *Id.*

[253] AR 74.

[254] AR 75-79.

[255] AR 75.

United States District Court
Northern District of California

loan officer, mortgage-closing clerk, title specialist, mortgage-loan processor, and a lifeguard.[256] The ALJ then posed a hypothetical question to the VE whether an individual of Mr. Cahill's same education and vocational history, could perform any of his past relevant work if that person had the following limitations: (1) capable of no more than light exertional activity, provided a discretionary sit-or-stand option is afforded; (2) precluded from the use of the left dominant upper extremity to any more than incidental (no more than one-sixth of an eight-hour day) overhead reaching, or unsupported forward reaching; (3) no task entailing rapid repetitive motion; (4) precluded from any task entailing unprotected heights or dangerous machinery; (5) restricted to simple, routine, repetitive tasks, with no more than incidental (no more than one-sixth of an eight-hour day) exercise of independent judgment or discretion; (6) no more than incidental change in work process; (7) and no piecework production, rate, and pace.[257] The VE testified that such a person could not perform Mr. Cahill's past work.[258] That person could perform work as a ticket taker, ticket seller, or a mail clerk.[259]

The ALJ then added to the hypothetical that the person would need unscheduled rest breaks throughout the course of an eight-hour day.[260] The breaks would be indeterminate in number, frequency, or duration.[261] On average the rest breaks would be 15 minutes per hour.[262] The VE testified that a person with those limitations could not perform the above-mentioned work of a ticket taker, ticket seller, or mail clerk and it would eliminate other jobs in the national economy.[263]

---

[256] *Id.*

[257] AR 76-77.

[258] AR 77.

[259] *Id.*

[260] AR 78.

[261] *Id.*

[262] *Id.*

[263] *Id.*

### 2.4 Administrative Findings

The ALJ held that Mr. Cahill was not disabled within the meaning of the Social Security Act from June 29, 2009 through March 31, 2012 (the date last insured).[264]

The Social Security Administration has established a five-step evaluation process to determine if an individual is disabled.[265] At step one, the ALJ must determine if the individual is engaging in "substantial gainful activity."[266] At step two, the ALJ must determine whether the individual has a "medically determinable impairment" that is "severe" or a combination of impairments that is "severe."[267] At step three, the ALJ must determine if the individual's impairments are severe enough to meet a listed impairment.[268] At step four, the ALJ must determine the individual's "residual functional capacity" and determine if the individual can perform "past relevant work."[269] At step five, the ALJ must determine if the individual can perform any other work.[270]

At step one, the ALJ found that that Mr. Cahill did not engage in substantial gainful activity from June 29, 2009 to March 31, 2012.[271]

At step two, the ALJ found that Mr. Cahill had the following severe impairments: "chronic neck and back pain disorder."[272] The ALJ found that the condition reduced Mr. Cahill's ability to do some basic physical work activities.[273]

At step three, the ALJ found that Mr. Cahill did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[274] In making this determination, the ALJ found that Mr. Cahill did not "demonstrate loss of motion, radiculopathy, impaired use of

---

[264] AR 29.

[265] AR 30.

[266] *Id.*

[267] *Id.*

[268] *Id.*

[269] *Id.*

[270] AR 31.

[271] *Id.*

[272] *Id.*

[273] *Id.*

[274] *Id.*

1  any extremity, or impairment of gait and station, and therefore did not satisfy any of the

2  musculoskeletal listings."[275]

3      Before considering the fourth step, the ALJ determined that Mr. Cahill had the residual

4  functional capacity to perform light work.[276] Mr. Cahill must be afforded the opportunity to

5  alternate between sitting and standing as needed to relieve his pain.[277] The ALJ determined that

6  Mr. Cahill was not able to use his "dominant left upper extremity for more than incidental

7  overhead reaching or unsupported forward extension at or above shoulder level."[278] The ALJ also

8  found that Mr. Cahill was unable to perform tasks requiring repetitive motion of his affected arm

9  and he could not work at unprotected heights or around dangerous moving machinery.[279] The ALJ

10 determined that Mr. Cahill was restricted to "simple routine repetitive tasks involving only the

11 incidental use of independent judgment or discretion."[280] The ALJ found that Mr. Cahill should

12 work with few changes in work process, and without a "piecework-style" production rate.[281]

13     The ALJ followed a two-step process in which he (1) determined whether there was

14 underlying medically determinable physical or mental impairments that could reasonably be

15 expected to produce Mr. Cahill's pain or symptoms, and (2) determined the extent to which the

16 impairments limited Mr. Cahill's functioning.[282] The ALJ considered Mr. Cahill's testimony

17 regarding his ability to work, pain level, injuries, pain treatment, daily activities, and abilities.[283]

18 After considering the evidence, the ALJ determined that Mr. Cahill's impairments could

19 reasonably cause his symptoms, but the ALJ did not accept Mr. Cahill's statements about the

20 intensity, persistence, and limiting effects of these symptoms.[284]

21 ───────────────

   [275] *Id.*

22 [276] *Id.*

23 [277] *Id.*

   [278] *Id.*

24 [279] AR 32.

25 [280] *Id.*

26 [281] *Id.*

   [282] *Id.*

27 [283] *Id.*

28 [284] AR 33.

The ALJ considered Mr. Cahill's work history and categorized it as "extremely sporadic."[285] The ALJ determined that the evidence did not allow "a comfortable presumption that he would be working now even if unimpaired."[286] The ALJ also considered the evidence that Mr. Cahill did not take two prescribed medications because they were too expensive.[287] The ALJ determined that Mr. Cahill had some financial resources from his personal-injury suit that "could be used to relieve his pain."[288] The ALJ found that "if he has not used his money to obtain symptom relief, an obvious conclusion is that the pain simply is not severe enough to motivate him to take this action" and that this undercut Mr. Cahill's credibility of his reported symptoms.[289]

The ALJ determined that Mr. Cahill demonstrated "few abnormal clinical findings."[290] The ALJ relied on medical evidence that showed "only right ulnar neuropathy without evidence of damage to the long thoracic nerve, the spinal accessory nerves, the carpal tunnels, or the areas innervated by the cervical root."[291] The ALJ found that Mr. Cahill had never demonstrated abnormalities of gait, moved all extremities without difficulty, and demonstrated normal muscle strength, tone, and bulk.[292] The ALJ determined that Mr. Cahill showed no atrophy and consequently found that that proved he remained physically active.[293]

The ALJ further found that Mr. Cahill's daily living activities were not as drastically limited as he portrayed.[294] The ALJ relied on evidence that Mr. Cahill played video games, participated in more passive hobbies, could go on a two-mile bike ride on a paved trail, and was able to run errands, keep appointments, and do housework so long as he broke tasks down into parts.[295] The

---

[285] *Id.*

[286] *Id.*

[287] *Id.*

[288] *Id.*

[289] *Id.*

[290] *Id.*

[291] AR 34.

[292] *Id.*

[293] *Id.*

[294] *Id.*

[295] *Id.*

United States District Court
Northern District of California

ALJ also relied on evidence that Mr. Cahill had no significant mental disorder.[296] The ALJ determined that Mr. Cahill had greater day-to-day functioning than he was willing to admit.[297] The ALJ found that Mr. Cahill had no problem tolerating stress, dealing with authority figures, or managing ordinary activities.[298] The ALJ considered evidence that Mr. Cahill could walk three quarters of a mile without stopping, his day was not interrupted by pain amelioration, and he spent most of his time on a computer.[299]

Based on this evidence, the ALJ determined that Mr. Cahill did not have "markedly disruptive pain."[300] The ALJ concluded that Mr. Cahill could not perform any work that required him to lift and carry more than 20 pounds.[301] The ALJ found that Mr. Cahill could not use his dominant hand and arm for repetitive motions or overhead reaching or lifting.[302] The ALJ also found that Mr. Cahill's pain may interfere "with the ability to understand, remember, and carry out any[thing] but simple instruction, or to handle varied tasks."[303] The ALJ determined that Mr. Cahill could sustain competitive levels of concentration, task persistence, and work pace if he had only routine assignments.[304] The ALJ determined that Mr. Cahill could do such a job for five eight-hour days a week, or an equivalent schedule.[305]

At step four, for the reasons provided above, the ALJ determined that Mr. Cahill was unable to perform any past relevant work.[306] The ALJ determined that Mr. Cahill's past relevant work exceeds the limitations provided above.[307]

---

[296] *Id.*

[297] *Id.*

[298] *Id.*

[299] *Id.*

[300] *Id.*

[301] AR 35.

[302] *Id.*

[303] *Id.*

[304] *Id.*

[305] *Id.*

[306] *Id.*

[307] *Id.*

At step five, the ALJ found that Mr. Cahill had the residual functional capacity to perform unskilled light work with additional limitations.[308] The ALJ considered Mr. Cahill's residual functional capacity, age, education, and work experience.[309]

The ALJ credited the VE's testimony that Mr. Cahill could perform "the requirements of repetitive occupations such as ticket taker, ticket seller, or mail clerk."[310] The ALJ found the number of available jobs "significant" within the meaning of 20 C.F.R. §§ 404.1560(c) and 416.960(c).[311] The ALJ therefore determined that Mr. Cahill was not disabled from June 29, 2009, the alleged onset date, through March 31, 2012, the date last insured.[312]

## ANALYSIS

### 1.  Standard of review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the SSA commissioner if the claimant initiates the suit within 60 days of the decision. District courts may set aside the commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrew v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

---

[308] AR 36.

[309] AR 35.

[310] AR 36.

[311] *Id.*

[312] *Id.*

United States District Court
Northern District of California

### 2.  Applicable law

An SSI claimant is considered disabled if he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

### 2.1 Five-step analysis to determine disability

There is a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's residual functional capacity ("RFC"), is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart

United States District Court
Northern District of California

P, app. 2. *See* 20 C.F.R. § 404.1520(a)(4)(v).

For steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at 1098. At step five, the burden shifts to the commissioner. *Id.*

### 3.  Application

Mr. Cahill alleges that the ALJ erred in his decision by failing to consider all the evidence when making his residual-functional-capacity finding, and by failing to weigh the evidence properly when making his decision.[313]

### 3.1 The ALJ did not err by finding the relevant period under review to be from June 29, 2009 through March 31, 2012

As a preliminary issue, Mr. Cahill applied for Title II Social Security Disability ("SSD") benefits on September 7, 2011, alleging disability starting on June 29, 2009.[314] To be eligible for Title II benefits, an individual must "have disability insured status in the quarter in which [they] become disabled or in a later quarter in which [he is] disabled." 20 C.F.R. § 404.131(a). An individual must establish a disability on or before the date the individual was last insured for disability benefits. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Mr. Cahill was last insured March 31, 2012; he therefore must have established disability before this date.[315] Mr. Cahill submitted medical evidence that postdated March 31, 2012.[316] Because the evidence postdated the date last insured, the ALJ did not err when he chose to disregard the postdated evidence and when he found the relevant period of review from June 29, 2009 through March 31, 2012.

### 3.2 The ALJ erred in his residual-functional-capacity finding

The ALJ erred in his residual-functional-capacity finding by failing to provide clear and convincing reason for neglecting the opinions of treating physicians, and for disregarding the entirety of the VE's testimony.

In determining whether a claimant is disabled, the ALJ must consider each medical opinion in

---

[313] Motion for Summary Judgment – ECF No. 32

[314] AR 138-39.

[315] AR 31.

[316] AR 435-508.

United States District Court
Northern District of California

the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). Social Security regulations distinguish between three types of physicians: treating physicians; examining physicians; and non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Hollohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830). The opinion of a treating physician is given the greatest weight because, again, the treating physician is employed to cure and has a greater opportunity to understand and observe a claimant. *See Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996); *see also Magallanes*, 881 F.2d at 751.

Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (quotation and citation omitted).

After considering only part of the relevant evidence in the record, the ALJ found that Mr. Cahill had the residual functional capacity to perform "light work."[317] The ALJ found that Mr. Cahill's severe neck and back pain reduced his ability to do "basic physical work."[318] Furthermore, the ALJ found that Mr. Cahill had the following limitations: (1) he must be afforded the opportunity to alternate between sitting and standing; (2) he could not use his dominant left arm for "more than incidental overhead reaching or unsupported forward extension at or above shoulder level"; (3) he could not perform tasks requiring repetitive motion of his affected arm; and (4) he could not work at unprotected heights or around dangerous moving machinery.[319] The ALJ determined that Mr. Cahill was restricted to "simple routine repetitive tasks involving only the

---

[317] AR 31.

[318] AR 31.

[319] AR 31-32.

incidental use of independent judgment or discretion," and that he should work with few changes to work process and without a "piece-work style" production rate.[320]

The ALJ found that Mr. Cahill was unable to perform past relevant work because of his above-mentioned limitations; however, he could sustain competitive levels of concentration, task persistence, and work pace if he had only routine assignments.[321] The ALJ concluded that Mr. Cahill could do such a job for five eight-hour days a week, or an equivalent schedule.[322]

In making this residual-functional-capacity finding, the ALJ failed to address each medical opinion in the record and failed to provide clear and convincing reasons for neglecting the opinions of treating physicians. The ALJ considered medical evidence that showed "only right ulnar neuropathy without evidence of damage to the long thoracic nerve, the spinal accessary nerves, the carpal tunnels, or the areas innervated by the cervical root."[323] The ALJ considered that Mr. Cahill had never demonstrated abnormalities of gait, that he moved all extremities without difficulty, and that he demonstrated normal muscle strength, tone, and bulk.[324] The ALJ also considered relevant evidence that Mr. Cahill played video games, participated in more passive hobbies, could go on a two-mile bike ride on a paved trail, and was able to run errands, keep appointments, and do housework so long as he broke tasks down into parts.[325] The ALJ also considered evidence that Mr. Cahill had no significant mental disorder.[326] The ALJ considered evidence that Mr. Cahill could walk three quarters of a mile without stopping, that his day was not interrupted by pain amelioration, and that he spent most of his time on a computer.[327]

However, the ALJ failed to address in his decision Dr. Kandabarow's assessment that Mr. Cahill had difficulty abducting his shoulders, that his ability to bend forward was 80% of normal,

---

[320] AR 32.

[321] AR 35.

[322] Id.

[323] AR 34, 358.

[324] AR 34, 416.

[325] AR 34.

[326] Id.

[327] Id.

and that he had symptoms of degenerative disc disease at C5-6 and C6-7.[328] The ALJ also failed to include in his decision the MRI of Mr. Cahill's cervical spine on December 22, 2008, that showed osteophyte complexes present at C5-6 and C6-7, with no other abnormalities.[329] The ALJ failed to address and include Dr. Robbins's assessment that Mr. Cahill suffered from thoracic medial-branch disease.[330] The ALJ further failed to include in his decision Dr. Carroll's assessment that Mr. Cahill displayed continued winging of the scapula on the left side.[331] The ALJ did not address or include Dr. Coleman's assessment finding tenderness of the left paraspinal muscles in the mid-thoracic region, slight tactile allodynia, hyperesthesia, hyperalgesia, and decreased range of motion of the left shoulder.[332]

The ALJ further failed to consider all the relevant evidence from the VE in its totality. The ALJ posed two hypothetical questions to the VE.[333] The first hypothetical contained Mr. Cahill's educational and vocational history, as well as his physical limitations.[334] The ALJ credited the VE's testimony that Mr. Cahill could perform "the requirements of repetitive occupations such as ticket taker, ticket seller, or a mail clerk."[335] The second hypothetical contained the limitations that Mr. Cahill described in his testimony, including the need for unscheduled rest breaks.[336] The VE testified that these limitations would prohibit the ability to perform the tasks of a ticket taker, ticket seller, or a mail clerk and it would eliminate other jobs in the national economy.[337] Although the ALJ credited the VE's initial conclusion that Mr. Cahill could perform these tasks, he disregarded and completely failed to acknowledge the VE's testimony eliminating these jobs as a possibility.

---

[328] AR 254.

[329] AR 376, 378.

[330] AR 368.

[331] AR 353.

[332] AR 350.

[333] AR 75-79.

[334] AR 76-77.

[335] AR 77.

[336] AR 78.

[337] AR 78.

The ALJ erred in his residual-functional-capacity finding because he failed to consider the VE's testimony in its totality and failed to address the opinions of Mr. Cahill's treating physicians. The evidence is not substantially contradicted by the rest of the doctors' opinions, and therefore should be given controlling weight. The record does not contain "clear and convincing" evidence required to circumvent the treating physician's uncontradicted opinion. Even if the ALJ's finds that the opinion of a treating physician is contradicted, the ALJ must provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotations and citations omitted). The ALJ failed to do so by failing to address the treating physician's opinion at all.

After considering all the relevant evidence excluded from the initial ALJ decision, the ALJ may very well come to the same conclusion. However, the plaintiff is entitled to fair consideration by the ALJ.

### 3.3 The ALJ erred in his adverse credibility finding

Congress prohibits an ALJ from granting disability benefits based on a claimant's subjective complaints alone.  42 U.S.C §423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 404.1529(a) (an ALJ will consider "all [claimant's] symptoms, including pain, and the extent to which [claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence"). An ALJ is required to consider the entire case record when making specific credibility findings. *See* Social Security Ruling (SSR) 96-7p (the credibility finding "must be specifically sufficient to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). An ALJ "must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 958 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*)).

The ALJ discredited Mr. Cahill's statements about the intensity, persistence, and limiting

United States District Court
Northern District of California

effects of his symptoms.[338] The ALJ based this credibility determination on Mr. Cahill's testimony regarding his work history, pain levels, injuries, pain treatment, daily activities, and abilities.[339] However, the ALJ failed to use sufficiently specific finding in making his decision.

The ALJ found Mr. Cahill's work history to be "extremely sporadic." However, the ALJ failed to elaborate or explain what constituted this "extremely sporadic" work history. Mr. Cahill testified that he worked at a mortgage company between 2003 and 2009 as a compliance officer, auditor, loan coordinator, loan processor, underwriter, and post-closing specialist.[340] Without further explanation from the ALJ, it is unrealistic to conclude that Mr. Cahill's work history was sporadic.

The ALJ found that Mr. Cahill's pain was "not severe enough to motivate him to take action."[341] The ALJ based this conclusion on Mr. Cahill's testimony that he settled a personal-injury law suit and therefore presumably had "financial resources that could be used to relieve his pain."[342] However, the ALJ failed to explain how these presumed financial resources would allow Mr. Cahill to relieve his pain. Again, the ALJ failed to take into account Mr. Cahill's testimony as a whole. Mr. Cahill testified that he received approximately $74,000 for past medical bills alone.[343] And the settlement was not meant to include lost wages or pain and suffering.[344]

Additionally, the ALJ discredited Mr. Cahill's level of pain based on his rejection of opioid medications and surgery.[345] However, the ALJ failed to address Mr. Cahill's testimony that he didn't want to take anything addictive, and that he had "terrible" side effects to his previous medications.[346] In March 2011, Mr. Cahill discontinued the use Desipramine after he experienced

---

[338] AR 33.

[339] AR 32.

[340] AR 46.

[341] AR 33.

[342] *Id.*

[343] AR 73-74.

[344] *Id.*

[345] AR 33.

[346] AR 60.

United States District Court
Northern District of California

profound dizziness and lose of balance.[347] The ALJ also failed to address or credit the extensive

medical records documenting pain-management procedures, including steroid injections, medial-

branch blocks, physical therapy, radiofrequency ablation, acupuncture, muscle e-stimulator, and

non-opioid medication regiments.[348]

The ALJ failed to provide sufficiently specific reasons for discrediting Mr. Cahill's pain

complaint and therefore the ALJ erred in his adverse-credibility finding.

## CONCLUSION

Mr. Cahill's motion for summary judgment is granted, the Commissioner's cross-motion for

summary judgment is denied, and the case is remanded for further proceedings consistent with the

order.

**IT IS SO ORDERED.**

Dated: July 27, 2016

_____

LAUREL BEELER
United States Magistrate Judge

---

[347] AR 298.
[348] AR 33.